KEVIN V. RYAN (CSBN 118321)
United States Attorney

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> v. <br> GUINDI N. GUINDI, <br> Defendant. | No.: CR 05 00655 JSW <br> VIOLATIONS: 18 U.S.C. § 1343 — Wire Fraud (9 Counts); 18 U.S.C. § 1341 — Mail Fraud (2 Counts); 18 U.S.C. § 1956(a)(1)(A)(i) — Financial Transactions to Promote Unlawful Activity (3 Counts) <br> SAN FRANCISCO VENUE |

## INDICTMENT

The Grand Jury charges:

### BACKGROUND

At all times relevant to this Indictment:

1. Defendant GUINDI N. GUINDI ("GUINDI") was the founder, president and board member of Netcap Holdings, Inc. ("Netcap"). GUINDI represented himself as a venture capitalist with special access to stock in publicly-traded companies.

2. Netcap Holdings, Inc. ("Netcap") was a Delaware corporation that operated from its offices in San Carlos, California. GUINDI portrayed Netcap as an incubator for

INDICTMENT

start-up companies and a source of funding for high-technology businesses.

## THE SCHEME TO DEFRAUD

3. Between in or around March 1999 and February 2004, in the Northern District of California, the defendant,

**GUINDI N. GUINDI,**

did knowingly and intentionally devise a scheme and plan to defraud, and to obtain money and property by means of materially false and fraudulent promises, representations and statements, well knowing that the promises, representations and statements were materially false when made.

4. It was part of the scheme to defraud that GUINDI raised investment funds from investors through two different, but overlapping and interlocking, components: (A) raising investment funds through the purported purchase of restricted stock in various well-known companies; and (B) raising investment funds by and through a company called Netcap.

A. **The IPO Component**

5. It was part of the scheme to defraud that GUINDI raised funds for purposes other than those intended by investors by representing that he had special access to restricted stock.

6. In 1999 and early 2000, numerous companies were "going public," that is, holding Initial Public Offerings ("IPOs") to raise large amounts of capital. During this time, virtually all IPOs were bid up substantially over their initial price as soon as they began trading over public markets, often resulting in massive gains for the initial shareholders. IPO stock was therefore highly coveted.

7. Most investors do not have access to IPO stock at the initial offering price (the "IPO price"). IPO stock at IPO price is generally available only to insiders, highly-placed executives, and their best customers.

8. Beginning on or around March 1999, and continuing through on or about November 2000, GUINDI made the representation to various investors that he had special

INDICTMENT 2

1  access to restricted IPO stock through special connections GUINDI claimed he had at
2  brokerage houses such as Morgan Stanley and Fidelity. This representation, as GUINDI
3  well knew at the time he made them, was materially false.

4  9.  Among the IPO stocks to which GUINDI claimed to potential investors he
5  had access were shares in well-known companies that were "going public" during that
6  time period, including United Parcel Service (UPS), WebMethods (WEBM), Sycamore
7  Networks (SCMR), Freemarkets (FMKT), Avanex (ANMX), Silicon Laboratories, Inc.
8  (SLAB), and Palm (PALM).

9  10.  GUINDI offered investors the opportunity to purchase, by and through him,
10 IPO stock in one or more of the above-mentioned companies. These investors otherwise
11 had no access to this restricted stock

12 11.  To assure investors that he actually had access to IPO stock, as well as to
13 verify he had actually purchased them, GUINDI showed certain investors a document
14 purporting to represent his investment portfolio at Charles Schwab. The Charles Schwab
15 document purported to reflect that GUINDI had stock holdings valued at more than $16
16 million, when in fact, as GUINDI well knew, the document was materially false and
17 fraudulent, and GUINDI never had holdings worth anywhere near $16 million.

18 12.  GUINDI told investors that the IPO stocks were subject to a six-month
19 "lock-up period" during which the investors could not trade the stocks. GUINDI further
20 told investors that he would keep the IPO stock in his Charles Schwab account during the
21 six-month lock-up period, after which the investor could sell or transfer the stock as he or
22 she wished.

23 13.  Based on GUINDI's material misrepresentations, promises and statements,
24 various investors gave GUINDI a total of approximately $950,000 to purchase pre-agreed
25 numbers of shares of IPO stock on the investors' behalf.

26 14.  GUINDI did not purchase the IPO stock as promised. In fact, contrary to
27 his representations to investors, and as he well knew at all times, GUINDI did not have
28 special access to restricted IPO stock. Instead, he diverted the investors' money primarily

INDICTMENT                                3

1  toward personal expenditures, repaying earlier investors, and as seed money for Netcap
2  Holdings, as described in paragraph 17, below.
3      15. As the lock-up periods began to expire, investors attempted to collect their
4  investment money from GUINDI. GUINDI repaid several investors using other
5  investors' money. To other investors, GUINDI gave false explanations why he could not
6  immediately repay them.
7      B.   The Netcap Component
8      16. It was also part of the scheme to defraud that GUINDI raised funds for
9  purposes other than those intended by investors through a startup business called Netcap
10 Holdings.
11     17  GUINDI formed Netcap Holdings in 2000 and had it incorporated in
12 Delaware. GUINDI represented to potential investors that Netcap operated as an
13 incubator for start-up companies and a source of funding for high-technology businesses.
14 GUINDI solicited investments in Netcap at $2 per share. GUINDI also used as seed
15 money for Netcap money that investors had given GUINDI to purchase IPO stock, as
16 described in paragraphs 5 through 15, above.
17     18. To give Netcap an aura of legitimacy, GUINDI arranged for the company to
18 lease office space in San Carlos. GUINDI also hired various individuals to compose a
19 "management team."
20     19. To entice investments in Netcap, GUINDI intentionally made materially
21 false representations, promises and assurances to investors, including the following:
22     a.   That most investment monies would, in fact, be used for investment in technology and startup businesses.
23     b.   That well-known individuals such as Lee Iacocca had agreed to sit
24         on Netcap's Board of Advisors.
25     c.   That Netcap had invested $5 million in a startup company called Data Entry Systems.
26
27     d.   That wealthy Saudi investors would be making multi-million-dollar investments in Netcap.
28 //

INDICTMENT     4

  c. That GUINDI's personal stock portfolio at Charles Schwab and other brokerage houses was worth anywhere from $1.6 to $20 million.

  f. That Netcap served as a financial founder of Build to Order, Inc.

  g. That GUINDI had invested millions of dollars of his own money in Netcap.

20. Based on these materially false representations, promises and assurances, investors invested a total of approximately $2.5 million in Netcap.

21. GUINDI made little or no effort in spending this money on its stated purposes. Instead, after paying for employee salaries and other expenses—as well as an investment in Data Entry Systems that was far smaller than what he had represented to investors—GUINDI treated the Netcap money as if it were his own spending money.

22. GUINDI wrote himself checks totaling more than $1.6 million and spent the money on personal non-investment expenses, such as gambling in Las Vegas casinos and paying previous investors who complained to him.

## COUNTS ONE through NINE: 18 U.S.C. § 1343 (Wire Fraud)

23. Paragraphs 1 through 22 are realleged as if fully set forth herein.

24. On or about the following dates, in the Northern District of California and elsewhere, for the purpose of executing a scheme to defraud, the defendant,

      GUINDI N. GUINDI,

did knowingly transmit or cause to be transmitted the following wire communications in interstate commerce:

| Count | Date | Wire Communication | From | To |
|---|---|---|---|---|
| ONE | 11/2/00 | Email from GUINDI to IPO Investors | Earthlink (guindi@earthlink.net) | Various email servers |
| TWO | 1/29/01 | Wire transfer of $250,000 | National Financial Serv. Corp., Boston, MA | Wells Fargo, Burlingame, CA |
| THREE | 1/31/01 | Wire transfer of $40,000 | Wells Fargo, Burlingame, CA | Bank of America (through CO) |

INDICTMENT        5

| Count | Date | Wire Communication | From | To |
|---|---|---|---|---|
| FOUR | 1/31/01 | Wire transfer of $10,000 | Wells Fargo, Burlingame, CA | Bank of America (through CO) |
| FIVE | 3/12/01 | Telephone call between GUINDI & Netcap Investor | Spring, TX | Burlingame, CA |
| SIX | 4/23/01 | Wire transfer of $25,000 | Northern Trust Int'l Bank, New York NY | Wells Fargo, Burlingame, CA |
| SEVEN | 7/10/01 | Telephone call between GUINDI & Netcap Investor | Spring, TX | Burlingame, CA |
| EIGHT | 1/29/02 | Telephone call between GUINDI & Netcap Investor | Spring, TX | Burlingame, CA |
| NINE | 2/18/04 | Telephone call between GUINDI & Netcap Investor | Spring, TX | Burlingame, CA |

All in violation of Title 18, United States Code, Section 1343.

<u>COUNTS TEN though ELEVEN</u>: 18 U.S.C. § 1341 (Mail Fraud)

25. Paragraphs 1 through 24 are realleged as if fully set forth herein.

26. On or about the dates set forth below, in the Northern District of California and elsewhere, for the purpose of executing, and in furtherance of, a scheme and artifice to defraud, and in attempting to do so, the defendant,

GUINDI N. GUINDI,

did knowingly cause to be placed in a post office and authorized depository for mail matter the items listed below to be sent and delivered by the United States Postal Service according to the directions thereon:

| Count | Date | Mailing | From | To |
|---|---|---|---|---|
| TEN | 4/13/01 | Check for $25,000 | Investor in Tiburon, CA | GUINDI/Netcap |
| ELEVEN | 4/18/01 | Check for $25,000 | Investor in Tiburon, CA | GUINDI/Netcap |

All in violation of Title 18, United States Code, Section 1341.

//
//
//

INDICTMENT                                6

COUNTS TWELVE though FOURTEEN: 18 U.S.C. § 1956(a)(1)(A)(i) (Financial Transactions to Promote Unlawful Activity)

27.   Paragraphs 1 through 26 are realleged as if fully set forth herein.

28.   On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant,

GUINDI N. GUINDI,

did knowingly conduct financial transactions, in and affecting interstate commerce, with the proceeds of a specified unlawful activity, to wit: wire fraud, in violation of 18 U.S.C. § 1343, and mail fraud, in violation of 18 U.S.C. § 1341, with the intent to promote the carrying on of the specified unlawful activity, as follows:

| Count | Date | Transaction | From | To |
| --- | --- | --- | --- | --- |
| TWELVE | 1/30/01 | Transfer of $125,000 | Wells Fargo #0165078692 | Wells Fargo #0056017965 |
| THIRTEEN | 1/31/01 | Wire transfer of $40,000 | Wells Fargo #0056017965 | Bank of America #01431 |
| FOURTEEN | 1/31/01 | Wire transfer of $10,000 | Wells Fargo #0056017965 | Bank of America #01425 |

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

Dated:

10/18/05

A TRUE BILL.

FOREPERSON

KEVIN V. RYAN
United States Attorney

EUMI L. CHOI
Chief, Criminal Division

(Approved as to form: _____ )
AUSA MICHAEL LI-MING WANG

7